IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

KATRINA GRUBE,

                  Claimant,                  OPINION AND ORDER

v.                                                    17-cv-791-wmc

NANCY A. BERRYHILL,

                  Defendant.

---

Claimant Katrina Grube seeks judicial review of a final decision of defendant Nancy A. Berryhill, the Acting Commissioner of Social Security, under 42 U.S.C. § 405(g), which denied her application for supplemental security income.[1] On appeal from a finding that she was not disabled, Grube contends that Administrative Law Judge Michael Schaefer (the "ALJ") failed to adequately account for "her long history of violence when interacting with others." (Opening Br. (dkt. #9) 1.) For the reasons discussed below, the Commissioner's decision will be affirmed.

BACKGROUND[2]

Grube was born on August 1, 1985. (AR 20.) She filed an application for supplemental security income on May 21, 2013, with an alleged onset date of September

---

[1] Grube originally sought child disability insurance benefits as well, but has since conceded that she is not entitled to them. (Reply (dkt. #12) 1.) Accordingly, the court will only address her remaining claim for supplemental security income.

[2] The court notes that claimant's opening brief included over fifty pages of transcript from claimant's hearing. (*See* Opening Br. (dkt. #9) 2-55.) As noted on the docket of this, and every other social security case, the court has the *entire* administrative record available, including the hearing transcript, making this inclusion unnecessarily duplicative and a waste of time. Likewise, the court prefers to review the transcript in the context of the administrative record, because then it maintains the same pagination.

1, 1999.³  (*Id.*)  Her application was denied initially and on reconsideration.  (*Id.*)  On her way to graduating high school, Grube attended special education classes.  (AR 58-59.)  After graduation, she went to technical college, but dropped out after falling behind in her coursework due to mental health issues and surgery.  (*Id.*)

### A. Hearing Testimony

On May 12, 2016, Grube appeared at a video hearing in front of the ALJ.  In the fall before her hearing, she testified that a temp agency had placed her with two, different employers.  At the first, she assembled cell phone covers for three weeks, and at the second, she sorted potatoes for a week and a half.  In both instances, she reported having "to quit because of fights" with her coworkers.  (AR 61-62.)

To be fair, Grube's actual testimony was contradictory as to the reasons for her stopping work.  Initially, Grube testified that she left the first position because of an injury she received while fighting with a coworker, which necessitated time off from work to recover.  Later, she reported the company asked that she not return because the coworker had filed complaints against her.  On the other hand, Grube testified that the quarrel with her colleague was only a verbal argument (AR 62-63), leaving at least the role of any injury from the fight in doubt.  As to the second job, Grube testified that she had to leave because of fights, but then stated that there was no "fight or disagreement with coworkers or

---

³ At the initial hearing before the ALJ, Grube amended her alleged onset date to "the application dates of her current disability applications," but at a subsequent hearing renewed her claim back to the age of 14.  Since her childhood disability and supplemental security income claims were denied, and are no longer appealable, the ALJ found any claim for benefits before August 1, 2007 (when she turned 22), was barred, but he nevertheless considered her medical history before that time to the extent relevant to her application as an adult.

2

supervisors," and the employer actually declined to rehire her after she missed a handful of days due to illness. (AR 61, 64.)

Regardless, Grube acknowledged a long history of violence. While in school, Grube admitted to both fighting *and* injuring teachers and classmates. (AR 74 (testifying she stabbed her kindergarten teacher's hand with a pencil when the teacher tried to take away a drawing); *id.* (testifying she broke another teacher's arm after he put his hand on her shoulder as she was "getting into a fight with another student"); AR 75 (testifying that after breaking the teacher's arm, she also "slammed [the other student's] head into the locker and broke her nose"); *id.* (testifying she would beat up other students when they upset her).) Grube further testified that she was still upset by people her age who learned that she "see[s] ghosts and people think that [she is] crazy or insane or stupid." (AR 75-76.)

Grube's mother similarly testified that claimant "was constantly in fights, hurting people" in and out of school." (AR 88 (testifying claimant "gets very nervous, uptight" or may "have a panic attack" around non-family members); AR 88-89 (testifying that claimant gets in fights, suffers from anxiety and "now . . . goes through spasms"); AR 91 (testifying that claimant gets violent "[i]f someone says the wrong thing or does the wrong thing"); AR 92 (testifying claimant "gets kind of violent" and throws things).) A family friend, Terry Enney, also testified that Grube got mad "unexpectedly."[4] (AR 83.)

Finally, Grube's mother described her history of violence with medical

---

[4] Mr. Enney's testimony is of limited value for a number of reasons: (1) portions of the questions include "(INAUDIBLE)" words, making the testimony hard to decipher; (2) his testimony lacked illuminating details; and (3) his testimony contradicted itself.

3

professionals. (AR 79 (testifying she broke one doctor's nose, another's arm, and a third's car windows when they said that her father molested her); *id.* (testifying she scared a doctor by telling her that the doctor's brother and mother were standing behind her advising her to be nicer).)

**B. Claimant's Prior Statements about Socialization**

Plaintiff's own statements about her desire and ability to interact with others are not entirely consistent. For example, in her adult function report from July 6, 2013, Grube reported that she may spend time with her sister and her sister's children approximately "3 times a week," but only when she feels like it, and that she and her older sister "don't see eye to eye." (AR 381-82.) Grube also reported not liking to start conversations with other people or talking to others. (AR 382.) She similarly noted that her illnesses affected her ability to get along with others, and she does not "like other people." (*Id.*) She added that she "get[s] mad quick," "can't have people sitting behind [her]," and does not "like people that [she] do[esn't] understand." (AR 383.) Finally, Grube reported getting particularly scared when she has to talk to others about herself. (AR 384.) Around that same time, the claimant's mother added that claimant "argues a lot with everyone" and "doesn't care to be around others." (AR 390.)

In contrast, Grube reported in March 2014 that she shops with her sister once or twice a week. (AR 419.) When asked if she had difficulty getting along with people, she responded "me and my mom fight a lot. But everyone else is good." (AR 420.) However, she later volunteered that she was "really bad at getting along with other[s] because of my short temper and my outbursts. I don't like strangers. I don't feel [comfortable] around

4

people I don't know. I don't like doing things in front of other people." (AR 422.) When asked how she gets along with authority figures, she further responded, "no good." (AR 421.)

Grube's medical records from November 2014 through January 2016 also refer to her reporting a fiancé or ex-fiancé. (AR 1150, 1159, 1165, 1171, 1364, 1366.) Her January 2016 medical records reflect her complaining about her ex-fiancé's imprisonment in early 2016 and to her being "in another relationship with a man younger than herself." (AR 1364.) Grube's medical records also indicate she took "a small vacation with her friend to take her mind off all the stress" in late May 2014 (*see* AR 1178), while she denied "being stressed about [family interactions at Christmas and a planned family get together]" (AR 1159). At different times, she also reported living with "friends." (AR 432 (reported living with friends in October 2014); AR 1171 (reporting that she and her mother had had trouble finding stable housing, resulting in her being homeless for a period and staying with her mother's friends); AR 1144 (reporting that one of her friends had moved in with Grube and her mother for approximately two months).)

### C. Medical Assessments

On November 22, 2013, a state agency psychologist, Darrell Snyder, Ph.D., opined that claimant was: (1) moderately limited in her ability to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; (2) not significantly limited in her "ability to work in coordination with or in proximity to others without being distracted by them"; and (3) mildly limited in "social interaction," "[e]asily upset and perhaps too dependent." (AR 115-16.) Nevertheless, Snyder opined

5

that Grube "is able to sustain an environment involving direct contact with coworkers, direct supervision or dealing with the public when TX [treatment] compliant." (AR 116.) On November 20, 2013, a consultative examiner, Travis Hinze, Ph.D., had likewise opined that "claimant would probably have mild impairment in [her capacity to respond appropriately to supervisors and coworkers]." (AR 1067.) Finally, another state agency psychologist, Joseph Cools, Ph.D., agreed with Snyder's assessment on May 7, 2014, adding that Grube was "able to relate adaptively to others" and "would behave in a socially appropriate manner with very little contact with the general public." (AR 144.)

On February 8, 2016, claimant's treatment provider, Dr. Filza Hussain, also opined that claimant would have moderate limitations in her ability to: (1) "work in coordination with or in proximity to others without being distracted by them," (2) "interact appropriately with the general public," and (3) "get along with coworkers or peers without distracting them or exhibiting behavioral extremes."[5] (AR 1237.) Hussain also opined that claimant would have slight limitations in her ability to: (1) "ask simple questions or request assistance"; and (2) "maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness."[6] (*Id.*)

On May 6, 2016, Dr. Hussain largely affirmed her previous opinion in a "medical source statement of mental ability to do work-related activities," concluding that claimant

---

[5] The mental capacity assessment form defined "moderate" as "[t]he individual will have intermittent difficulty performing in this area. The individual can generally perform satisfactorily in this area but not always." (AR 1236.) The court also notes that Dr. Hussain's mental capacity assessment is difficult to read because some of his checkmarks are barely visible. (AR 1237.)

[6] The mental capacity assessment form defined "slight" as "[t]here is some mild limitation in this area, but the individual can generally function satisfactorily." (*Id.*)

6

had moderate restrictions in her ability to interact appropriately with the public, supervisors, and coworkers.[7] (AR 1407.) Likewise, Hussain opined that claimant would be moderately restricted in her ability to "[r]espond appropriately to usual work situations and to changes in a routine work setting." (*Id.*) Hussain added that claimant's "borderline personality disorder makes interaction with others challenging." (*Id.*)

**D. ALJ's Decision**

Ultimately, after reviewing the record, the ALJ held that Grube was not disabled as of September 1, 1999.[8] (AR 20-21.) In particular, the ALJ found since May 13, 2013, that Grube's severe impairments were anxiety disorder, post-traumatic stress disorder, borderline personality disorder, mood disorder, obesity, plantar fasciitis, and scoliosis. (AR 23.) However, these severe impairments did not meet or medically equal a listed impairment. (AR 26.) In fact, the ALJ concluded that Grube's activities of daily living were only mildly restricted during all relevant times because she reported cooking, doing chores, and shopping, with only physical -- and "not psychological" -- limitations. (*Id.*)

The ALJ further found that Grube only had moderate difficulties in social functioning because of: her frequent socializing with her sister and her family; her discomfort in starting conversations with people she did not know well; her mother's

---

[7] The medical source statement similarly defined "moderate" as "[t]here is more than a slight limitation in this area but the individual is still able to function satisfactorily." (AR 1405.)

[8] Because Grube had most recently been denied childhood disability benefits on July 31, 2009, the ALJ found that the earliest date she could be found disabled due to *res judicata* would be August 1, 2009, because she was older than 22 on that date. (AR 20.) Still, as previously noted, the ALJ evaluated her eligibility from her alleged onset date of September 1, 1999, "to give her the benefit of every doubt." (AR 20-21.)

assessment that she did not enjoy being around people (and was argumentative); and her history of panic attacks caused by social situations and fighting with others since her father's death when she was approximately 10 years old. (AR 26-27.) Notwithstanding Grube's inability to work through a temporary agency, and her testimony about having quit both jobs because of fighting with coworkers, the ALJ found that claimant had only moderate difficulties with concentration, persistence and pace, also concluding she had no episodes of decompensation during the relevant periods. (AR 27-28.)

Ultimately, the ALJ held that Grube would be able to perform light work, with a number of restrictions, including only "occasional" contact with others. (AR 29.) Likewise, he limited her to simple, routine and repetitive tasks requiring simple judgment, with few workplace changes. (*Id.*) Finally, he found Grube could be off-task up to 10% of the time, plus regularly scheduled breaks. (*Id.*)

During the hearing, the vocational expert testified that employers would meet verbal altercations with a three-strikes-you're-out response, while a physical altercation would result in immediate termination. (AR 103.) Based on this residual functional capacity ("RFC"), the ALJ accepted the expert's opinion that Grube was not disabled because she could perform "a significant number of jobs available in the economy" that the vocational expert had identified: machine feeder, production, and stock clerk. (AR 37.)

OPINION

This court must defer to an ALJ's decision to deny benefits unless unsupported by substantial evidence or based on an error of law. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Substantial evidence means "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Ultimately, the ALJ must create an "accurate and logical bridge" between the evidence and the conclusion that the claimant is not disabled. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). A reviewing court will not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citations omitted). Still, the court must conduct a "critical review of the evidence." *McKinzey*, 641 F.3d at 889.

As noted at the outset of this opinion, claimant principally contends that the ALJ erred by failing to account fully for a long history of violence in her RFC. Specifically, claimant points to her mood instability, and inability "to function in a non-familial setting":

> The Plaintiff testified that she was unable to work at two places because of fighting; she . . . has never learned to drive; only has two friends; stabbed a teacher's hand for taking a piece of paper away . . .; broke a teacher's arm because the teacher put his hand on her shoulder when the Plaintiff was 14 years old; slammed another student's head into a locker and broke the student's nose; after a doctor accused Plaintiff's father of molesting [her,] the Plaintiff punched the doctor and broke his nose; a second doctor also accused the Plaintiff's father of molesting [her] and the Plaintiff used a chair to break the second doctor's arm; a third doctor also accused the Plaintiff's father of molesting [her] and the Plaintiff broke the doctor's car windows.

(Opening Br. (dkt. #9) 56-57 (citations to the record omitted).) Claimant relies on these incidents to argue that she could not sustain work activities because she "suffers from severe social deficiencies" and an inability to "work cooperatively with her co-workers."

9

(*Id.* at 57, 59, 62.)

Defendant responds by arguing that plaintiff's argument is not focused on the appropriate timeframe, since applications for SSI are *forward-looking* -- not retroactive -- and many of the examples of violence she identified not only "predate her May 2013 application," but were insufficient to establish disability in her prior application.[9] (Opp'n (dkt. # 11) 1, 4.) Additionally, defendant points out that the ALJ's findings and conclusion were supported by medical opinions in the record that revealed mild or moderate limitations, including claimant's treating physician, as well as the vocational expert's testimony that there were jobs available with limited social interaction. (*Id.* at 5-7.)

The court agrees. In his opinion, the ALJ recognized claimant's history of fighting with others:

> The claimant's mother reported that her daughter had been fighting with others since her father died when she was about 10 years old.
> 
> \*   \*   \*
> 
> At the hearing held before me on May 12, 2016, the claimant testified that she tried to work through a temporary agency [in] August 2015, but quit both jobs because of fights with coworkers. In fact, at the second job site, she reported getting injured after getting into an altercation with a coworker. After the coworker filed complaints against her, she stated that her employer had contacted her and told her not to come back.

(AR 27.)[10]

---

[9] "Under title XVI, there is no retroactivity of payment." Social Security Ruling 83-20: Titles II and XVI: Onset of Disability (rescinded Oct. 2018). *See also* Determining the Established Onset Date (EOD) in Disability Claims, 83 Fed, Reg. 49,613, 49,614 (Oct. 2, 2018) ("[W]e cannot make retroactive payments based on disability under title XVI of the Act.")

[10] The ALJ appears to have confused claimant's testimony about the two jobs and disregarded the contradictory testimony discussed above.

10

In light of this, the ALJ found that Grube "could tolerate only occasional, brief and superficial, interactions with the public and only occasional interaction with co-workers and supervisors." (AR 29.) This RFC finding was supported by the opinions of Darrell Snyder, Ph.D., Joseph Cools, Ph.D., and Travis Hinze, Ph.D., as well as claimant's treating physician, Dr. Filza Hussain. (AR 116 (Snyder opining claimant was not significantly limited in her ability to work near or with others, mildly limited in social interaction, and could "sustain an environment involving direct contact" with others); AR 144 (Cools opining that claimant was not significantly limited in her ability to work with or near others and mildly limited in social interactions); AR 1067 (Hinze opining claimant would probably have "mild impairment" in her ability to respond appropriately to coworkers and supervisors); AR 1237 (Hussain opining claimant had moderate limitations in her ability to work near or with others without distraction, interact appropriately with the public, and get along with coworkers, as well as slight limitations in her ability to ask questions and seek help or "maintain socially appropriate behavior"); AR 1407 (Hussain opining claimant was moderately restricted in her ability to interact appropriately with: supervisors, the public, and coworkers).)[11]

The ALJ needed only to build a logical bridge between the evidence and his conclusions. Notwithstanding the testimony of claimant and her mother (and to a substantially lesser extent, her friend), the ALJ did just that by relying on medical evidence and opinions suggesting residual functional capacity, rather than the "not unbiased" nor

---

[11] In the end, only Cools opined that Grube "would behave in a socially appropriate manner with very little contact with the general public." (AR 144.)

11

wholly consistent observations of claimant and her mother.[12]

ORDER

IT IS ORDERED that the decision of defendant Nancy A. Berryhill, the Acting Commissioner of Social Security, denying Katrina Grube's application for supplemental security income is AFFIRMED. The clerk's office is directed to cancel the telephonic oral argument scheduled for May 29, 2019, and enter judgment and close this case.

Entered this 28th day of May, 2019.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge

---

[12] In her reply brief, claimant argues that the ALJ failed to incorporate Dr. Hussain's opinion that claimant would miss at least 2 days of work per month. (Reply (dkt. #12) 1-3.) However, arguments raised for the first time in reply are waived. *See United States v. Waldrip*, 859 F.3d 446, 451 n.2 (7th Cir. 2017) (citing *Mendez v. Perta Dental*, 646 F.3d 420, 423-24 (7th Cir. 2011)).